UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

v.

**DECISION AND ORDER**

1:15-CR-00204 EAW

JAMES A. MACCALLUM,

Defendant.

I.    **INTRODUCTION**

On March 24, 2017, a jury convicted defendant James A. MacCallum ("Defendant")

of mail fraud in violation of 18 U.S.C. § 1341. A revised presentence investigation report

("PSR") dated November 9, 2017, concluded that the total offense level that applied to

Defendant's conviction was 31. (Dkt. 84 at ¶ 57). The PSR's calculation of the offense

level included an 18-level enhancement pursuant to United States Sentencing Guideline

("U.S.S.G.") § 2B1.1(b)(1)(J) based on a finding that the total loss amount was $3,761,774;

a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii) based on a finding that

the offense resulted in substantial hardship to one or more victims; and a two-level

enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) based on a finding that the offense

involved sophisticated means. (*Id.* at ¶¶ 48-50).[1] Defendant objects to the loss amount

calculation, as well as the sophisticated means and substantial hardship enhancements.

---

[1]    The PSR also included a two-level enhancement for Defendant's role in the offense
pursuant to U.S.S.G. § 3B1.3. (Dkt. 84 at ¶ 52). Defendant does not challenge that finding.

For the reasons set forth below, the Court concludes that the total loss amount is greater than $2,000,000, but less than $2,500,000, warranting a 16-level, rather than an 18-level, enhancement. In addition, the Court finds that the Government established by a preponderance of the evidence that the offense resulted in substantial hardship to one or more victims and involved sophisticated means. However, because application of the two-level substantial hardship enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii) would violate the *ex post facto* clause of the Constitution, the Court uses the 2010 Guidelines Manual to calculate Defendant's offense level. The 2010 Manual does not contain the substantial hardship enhancement. As a result, the Court calculates a total offense level of 27.

## II.    BACKGROUND AND PROCEDURAL HISTORY

A grand jury returned a single-count indictment on November 5, 2015, charging Defendant with mail fraud in violation of 18 U.S.C. § 1341. (Dkt. 1 ("the Indictment")). The Indictment alleged as follows:

1.    Beginning in or about January 2008 and continuing to on or about December 13, 2010, the exact dates being unknown to the Grand Jury, in the Western District of New York, and elsewhere, the defendant, JAMES A. MACCALLUM, did devise, and intend to devise, a scheme and artifice to defraud investors ("victim investors"), persons known to the Grand Jury, and to obtain money and property from the victim investors by means of materially false and fraudulent pretenses, representations and promises.

2.    It was part of the scheme and artifice that the defendant, JAMES A. MACCALLUM, who at all times relevant to this Indictment was an attorney who practiced law in Chautauqua and Cattaraugus Counties, New York, offered false and fraudulent investment opportunities to persons with purported guaranteed rates of return ranging from 12 to 15 percent.

3.      It was further part of the scheme and artifice that, in order to entice prospective investors to invest money with the defendant, JAMES A. MACCALLUM, . . . falsely and fraudulently represented that the investments would be secured by real estate and life insurance policies, and that the investors would receive monthly and/or quarterly interest payments throughout the term of the investment, with the principal returned at the end of the investment. The defendant also offered victim investors the opportunity to "roll over" their investment at the end of the term thereby extending the time period of the investment.

4.      It was further part of the scheme and artifice that the defendant, JAMES A. MACCALLUM, counseled victim investors to liquidate other investments in order to purportedly benefit from the false and fraudulent higher rates of return the defendant offered on investments.

5.      It was further part of the scheme and artifice that the defendant, JAMES A. MACCALLUM, provided some victim investors with interest payments that came from money received from other victim investors in order to encourage the victim investors to invest more money with the defendant or to "roll over" their investments.

6.      It was further part of the scheme and artifice that the defendant, JAMES A. MACCALLUM, used a very small portion of the investor funds to purchase real estate.

7.      It was further part of the scheme and artifice that the defendant, JAMES A. MACCALLUM, deposited funds from victim investors into bank accounts maintained by the defendant and from these accounts, the defendant paid personal and other expenses including, but not limited to, salaries, office expenses, personal travel and life insurance premiums.

8.      It was further part of the scheme and artifice that from in or about January 2008, and continuing to on or about December 13, 2010, the defendant, JAMES A. MACCALLUM, received approximately $3,423,737 from victim investors.

9.      For the purpose of executing, and attempting to execute, the scheme and artifice, on or about December 13, 2010, in the

Western District of New York, the defendant, JAMES A MACCALLUM, did deposit, and caused to be deposited, to be sent and delivered by a private and commercial interstate carrier, a promissory note dated December 13, 2010, to A.M., a person known to the Grand Jury, in New Brunswick, Canada.

(*Id.*).

At trial, the Government presented evidence that from 2008 until 2010, Defendant received money from numerous victim investors and used the incoming money to pay other investors in furtherance of a classic Ponzi scheme, where one investor's money funded payments to other investors. The jury heard testimony from five victim investors, each of whom described how he or she sent money to Defendant with the intent that Defendant would invest the money with guaranteed rates of return in excess of 12 percent. Those victims did not receive the return that Defendant promised, and the evidence established that Defendant did not use the money as promised. Instead, Defendant paid his own personal expenses and used the money to further his fraudulent scheme. In some cases, Defendant invested victims' money in other schemes that turned out to be fraudulent. The evidence established that, as part of the scheme, one of the victims (A.M.)[2]—who was a citizen and resident of Canada—received a promissory note dated December 13, 2010, from Defendant sent by commercial interstate carrier. The note promised to pay $500,000,

---

[2]    The parties have at times used initials when referring to the alleged victims, and at other times used the victims' names. The Court recognizes that many of the victims' names have been publicly disclosed both through the trial and public filings. Nonetheless, for purposes of consistency, and because this Decision and Order may be more broadly disseminated than any of the parties' filings in this case, the Court will use initials when referencing the victims.

but at the time, Defendant had only approximately $5,000 available to make any such payment.

In addition to the victim investors, the jury heard testimony from Defendant's former business associates, employees of the Federal Bureau of Investigation ("FBI"), and perhaps most importantly, Defendant himself when he confessed to FBI Special Agent Brent Isaacson that he had perpetrated the Ponzi scheme. (*See* Dkt. 95-1 at 4-7). In his written statement, Defendant affirmed that he received about $4 million from his former father-in-law, R.G., from 2002 through 2010, for purposes of investing the money in properties and real estate development. The investments failed, causing Defendant to owe a significant debt to his father-in-law. In an effort to recover those losses, starting in approximately 2008, Defendant recruited other investors, falsely telling them that he would return a significant interest rate, typically 12 to 15 percent annually. Defendant then used the money from new investors to make payments to earlier investors. (*See id.*).

A jury trial commenced on March 20, 2017, and on March 24, 2017, the jury returned a guilty verdict. (Dkt. 70). A presentence investigation report was filed on June 6, 2017 (Dkt. 74), and sentencing was scheduled for July 11, 2017 (Dkt. 69). The Court adjourned sentencing at Defendant's request (Dkt. 76; Dkt. 78), and a revised presentence investigation report dated November 9, 2018, was filed on November 13, 2017 (Dkt. 84). The PSR calculated the base offense level of seven pursuant to U.S.S.G. § 2B1.1(a)(1), and then, as relevant to this Decision and Order, applied the following Specific Offense Characteristics:

     (1)    Concluding that the total loss was $3,761,774, the PSR increased the

offense level by 18 pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the total loss was more than $3.5 million but less than $9.5 million (*id.* at ¶ 48);

(2)     Concluding that the offense resulted in substantial hardship to one or more victims, the PSR increased the offense level by two pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii) (*id.* at ¶ 49); and

(3)     Concluding that the offense involved sophisticated means and Defendant intentionally engaged in or caused the conduct constituting sophisticated means, the PSR increased the offense level by two pursuant to U.S.S.G. § 2B1.1(b)(10)(C) (*id.* at ¶ 50).

Defendant objected to the PSR, arguing that the appropriate increase in the offense level due to the loss amount was 16 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I) because the total loss was $2,830,591.[3] (Dkt. 79 at ¶¶ 3-7). Defendant's initial dispute concerning the loss amount focused on the inclusion of alleged losses to R.G. (his father-in-law), who Defendant contended had not been shown to be a victim investor. (*Id.*). Defendant also contended that the two-level increases pursuant to U.S.S.G. §§ 2B1.1(b)(2)(A)(iii) and 2B1.1(b)(10)(C) should not apply. (*Id.* at ¶¶ 8-9).

The Government responded to Defendant's objections on November 9, 2017 (Dkt. 83), and Defendant replied on November 13, 2017 (Dkt. 85). Sentencing did not proceed as scheduled on November 14, 2017, as it was apparent that transcripts from the trial needed to be ordered in order to address Defendant's objections. After the preparation of

---

[3]     Defendant ultimately took a different position, arguing that the loss amount was under $2 million. The arguments of both parties have evolved with respect to the loss amounts, in part based on the Court's subsequent discovery of the potential *ex post facto* implications and the different threshold levels for loss amount set forth in the 2010 Guidelines Manual. Notwithstanding the parties' evolving positions, the Court has considered all of the parties' arguments, even to the extent that they have changed and arguably contradicted their initial submissions with respect to the loss amount.

the transcripts, the Government filed a supplemental submission on January 10, 2018 (Dkt. 95), and Defendant filed a supplemental submission on January 31, 2018 (Dkt. 96). In its supplemental submission, the Government took the position that Defendant's relevant conduct included not only his father-in-law as a victim, but also a trust involving his father-in-law and two additional victims not previously identified in the PSR (R.T. and D.H.). (Dkt. 95 at 3). Defendant contended in his supplemental submission that the loss amount was $1,643,147.75. (Dkt. 96 at 8).

Oral argument concerning the objections was held before the undersigned on February 13, 2018, at which time the Court reserved decision and scheduled sentencing to proceed on April 12, 2018.[4] After oral argument, Defendant submitted a further memorandum addressing the objections. (Dkt. 98). Thereafter, in connection with its consideration of the legal issues raised by the parties, the Court discovered a potential *ex post facto* issue that needed to be addressed with the parties. Accordingly, the April 12, 2018, sentencing date was converted to a status conference, and at that status conference, the Court advised the parties of its concerns about a potential *ex post facto* issue involving the two-level enhancement for substantial financial hardship under U.S.S.G. § 2B1.1(b)(2)(A)(iii), which did not come into effect until November 2015. Both parties filed memoranda in advance of that status conference (Dkt. 101; Dkt. 102), and after discussing the issues during the status conference, the Court set a schedule for further submissions (Dkt. 104). Both parties filed further memoranda addressing the sentencing

---

[4]     The Court initially scheduled sentencing for March 27, 2018, but due to a scheduling conflict, that date was adjourned to April 12, 2018. (Dkt. 97; Dkt. 99).

issues (Dkt. 105; Dkt. 106; Dkt. 107; Dkt. 108; Dkt. 110), and a further status conference

was held on May 24, 2018 (Dkt. 111), at which time the Court reserved decision and stated

that it would issue a written Decision and Order. The Court scheduled sentencing for July

3, 2018, at 11:00 AM, at the United States Courthouse in Rochester, New York.

## III.    ANALYSIS

"At sentencing, disputed factual allegations must be proven by the government by

a preponderance of the evidence." *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003).

However, sentencing proceedings are not "second trials," *United States v. Fatico*, 603 F.2d

1053, 1057 (2d Cir. 1979), and the sentencing court may use hearsay statements in

determining the sentence, *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987).

Here, neither party contends that an evidentiary hearing is necessary to resolve the

disputes. Instead, the parties agree that the Court may resolve any factual disputes

concerning Defendant's objections based on the record evidence, including the evidence

introduced at trial and the parties' post-conviction submissions.

### A.    EX POST FACTO ISSUES

"Article I of the United States Constitution provides that neither Congress nor any

state shall pass an 'ex post facto Law.'" *United States v. Ramirez*, 846 F.3d 615, 619 (2d

Cir. 2017) (quoting U.S. Const. art. I, § 9, cl. 3; *id.* art. I, § 10, cl. 1). A law violates this

constitutional prohibition "when it is: (1) retrospective, and (2) more onerous than the law

in effect on the date of the offense." *Id.* (citing *Weaver v. Graham*, 450 U.S. 24, 30-31

(1981)). Of course, the *ex post facto* prohibition applies to any law impacting sentencing.

*See* U.S.S.G. § 1B1.11(b)(1) ("[I]f the court determines that the use of the Guidelines

Manual in effect on the date the defendant is sentenced, would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.").

As the Second Circuit explained in *Ramirez*, because the one-book rule[5] applies in any application of the Sentencing Guidelines, a defendant cannot pick and choose "the best pieces from different versions of the guidelines." 846 F.3d at 623. Rather, when examining the second element in the *ex post facto* analysis—whether a current law is more onerous than the one in effect on the date of the offense—the sentencing judge must compare the total penalties (*i.e.*, the total recommended sentence under each applicable Guidelines Manual), not the individual impact from different provisions set forth in each Guidelines Manual. *Id.* at 622-24. "The relevant inquiry for *ex post facto* analysis is not whether a particular amendment to the Sentencing Guidelines is detrimental to a defendant, but whether application of the later version of the Sentencing Guidelines, considered as a whole, results in a more onerous penalty." *Berrios v. United States*, 126 F.3d 430, 433 (2d Cir. 1997).

Applying these principles, both parties agree that the Court must calculate the

---

[5]       The one-book rule is set forth in U.S.S.G. § 1B1.11(b)(2) as follows: "The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual. However, if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes." Amendment 792, changing the provisions of U.S.S.G. § 2B1.1(b)(2), effected a substantive change to the Guidelines and did not merely clarify the Guidelines' application. *United States v. Jesurum*, 819 F.3d 667, 672 (2d Cir. 2016).

sentencing range under the 2016 Guidelines Manual (*i.e.*, the manual in effect at the time of sentencing) and the 2010 Guidelines Manual (*i.e.*, the manual in effect at the time of the offense). (Dkt. 105 at 1-3; Dkt. 106 at 3). The manuals differ both in the threshold requirements pertaining to loss amount under U.S.S.G. § 2B1.1(b)(1) and the requirements for a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A). (*See* Dkt. 105 at 2 ("The 2016 Manual applies an 18-level adjustment when the loss is $3.5 million or more and a 2-level adjustment if one victim suffered a substantial financial hardship; whereas, the 2010 Manual applied an 18-level adjustment for a loss of $2.5 million or more and did not provide for an enhancement based on a single victim suffering substantial financial hardship.")). Thus, the Court must calculate the guidelines range under each manual, and then use the manual that results in the lowest potential penalty.

### B.  LOSS AMOUNT—U.S.S.G. § 2B1.1(b)(1)

The 2016 Guidelines Manual provides for a 16-level increase in the offense level if the loss amount is greater than $1,500,000, and an 18-level increase if the loss amount is greater than $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I), (J). The PSR calculated an 18-level increase based on a loss figure of $3,761,774, which included $931,184 from Defendant's father-in-law (R.G.). (Dkt. 84 at ¶ 48). Defendant objected, arguing that the record does not support a finding that he obtained money from R.G. as part of the scheme. (*See* Dkt. 79 at ¶¶ 3-6). Excluding the R.G. money from the loss figure entirely resolves the issue of the appropriate offense level increase under the 2016 Guidelines Manual's version of § 2B1.1(b)(1) because, without the R.G. money, the loss amount was less than $3,500,000.

Once the Court identified the potential *ex post facto* issue, the loss amount inquiry

became more complex. The relevant question was no longer whether the loss exceeded the $3,500,000 threshold because the 2010 Guidelines Manual provides different loss thresholds than the 2016 Guidelines Manual. The 2010 Guidelines Manual increases the offense level by 16 if the loss is greater than $1,000,000, and by 18 if the loss is greater than $2,500,000. *See* U.S.S.G. § 2B1.1(b)(1)(I), (J) (2010).

Calculating the loss attributable to Defendant's relevant conduct presents challenges given the very nature of Defendant's criminal conduct. Defendant deceived investors and disguised his use of their money. A sentencing court is, of course, required to make only a "reasonable estimate of the loss." *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1 Application Note 3(C)). Here, Defendant admitted to the FBI that beginning in 2008, he created a Ponzi scheme by telling investors that he would return "a significant interest rate, typically 12% to 15% per year on average" with no good faith belief that such a return would be realized. (Dkt. 95-1 at 5). Instead, he "used money from new investors to pay interest payments or principle payments to earlier investments." (*Id.*).

The parties agree that the loss figure should be at least $1,643,147, calculated as follows:

| Victim Investors | Initial Date | Investment Amount (Principal) | Investment Returned | Victim Investor Loss |
|---|---|---|---|---|
| S.A. | 01/01/2008 | $1,502,544 | $ 415,629 | ($1,086,915)[6] |
| N.W. & J.W. | 06/23/2008 | $ 100,000 | $ 17,750 | ($ 82,250) |
| C.C. & E.C.[7] | 09/24/2008 | $ 75,000 | $ 9,750 | ($ 65,250) |
| A.M. | 09/01/2009 | $ 446,232 | $ 37,500 | ($ 408,732) |
| TOTAL | | | | ($1,643,147) |

(*See* Dkt. 107 at 1-2 (setting forth Government's position concerning loss amounts); Dkt.

108 (Defendant contending that loss amount includes the above)).

The parties' disagreement concerning loss focuses on the following loss amounts

set forth in paragraph 39 of the PSR:

---

[6]     The parties agree that S.A. invested a total of $1,502,544 with Defendant, and Defendant returned $415,629. The PSR calculated the loss amount attributable to S.A. as $1,211,490. (Dkt. 84 at ¶ 39). The PSR's calculation contained a mathematical error. Deducting $415,629 from $1,502,544 yields $1,086,915. In a filing on May 18, 2018, the Government contended for the first time that the loss amount attributable to S.A.'s investments should be $1,435,149, because the $415,629 returned to S.A. included $348,234 of other investors' money (namely M.C., R.T., and A.M.). (Dkt. 107 at 3). Whether this additional $348,234 should be included in the loss calculation attributable to S.A.'s investments is addressed in further detail below.

In addition, Defendant contends that S.A.'s initial investments of $130,000 on February 29, 2008, and $194,700 on June 27, 2008, should not be included in the gross amount of his investments, as these investments were a success and legitimate. (Dkt. 96 at 7). The Court disagrees. The record supports the conclusion that Defendant's entire dealings with S.A. were part of the Ponzi scheme. Moreover, including these amounts does not impact at least the net calculation of S.A.'s losses because while the Court has included these amounts in the investment amount (principal), it has also deducted these amounts in calculating the investment returned. (*See id.*).

[7]     The Lawyer's Fund for Client Protection ultimately reimbursed victims C.C. and E.C., so any restitution ordered on account of this loss should be paid to that entity.

| Victim Investors | Initial Date | Investment Amount (Principal) | Investment Returned | Victim Investor Loss |
|---|---|---|---|---|
| M.B. | 09/22/2008 | $ 850,000 | $ 80,341 | ($ 769,659)[8] |
| M.C. (L.C. is deceased) | 01/08/2009 | $ 350,000 | $ 156,750 | ($ 193,250) |
| Z.B.-M. | 01/20/2010 | $ 99,960 | $ 0 | ($ 99,960) |
| R.G. | 01/09/2008 | $1,105,240 | $ 174,056 | ($ 931,183) |
| TOTAL | | | | ($1,994,052) |

In addition, although the PSR's calculations did not include money invested by D.H. and R.T. or money that Defendant obtained from the R.G. trust, the Government contends that money should be included in the loss calculation. (Dkt. 107 at 4-5). Each victim's loss figures are discussed below.

        1.     M.B.

Defendant objects to including any loss figure for M.B., contending that at trial M.B. testified that he invested $850,000 with Defendant with the understanding that Defendant would lend Michael Amos money to invest in property in Kentucky called Doe Valley Estates. (Dkt. 96 at 5). Defendant contends that Michael Amos swindled him and M.B., and therefore, the money from M.B. should not be counted as part of the loss. (*Id.* at 5-6).

The Government contends that of the $850,000 that M.B. invested with Defendant, $200,000 should be considered within the scope of relevant conduct since the bank records establish that Defendant used that money in or around September 2008, for the purchase of a second home for his in-laws. (Dkt. 107 at 2; *see* Dkt. 95-1 at 9; Dkt. 107-1 at 1-4).

---

[8] Although the PSR calculated the loss attributable to M.B. as $769,659, the Government has taken the position that $200,000 is the correct amount attributable to loss due to M.B.'s investments with Defendant. (Dkt. 107 at 1-2).

M.B. testified at trial that Defendant represented to him that he was putting together a group of "Christian men" to purchase property and turn it around for a profit. (Dkt. 89 at 82). M.B. had established a foundation to benefit a Christian school in Yorkshire, New York, and Defendant was familiar with M.B.'s foundation. (*Id.* at 81-82). Defendant represented to M.B. that he was a Christian, which caused M.B. to believe that he was honest. (*Id.* at 82-83). M.B. testified that he wired $850,000 to Defendant in September 2008, with the understanding that Defendant would turn it around and lend it to Pinnacle Management Group, owned by Michael Amos, for investment in Doe Valley Estates. (*Id.* at 85). Defendant assured M.B. that his money was "safe, it was a good deal, he has done hundreds of them before" and "he assured" M.B. that "it would be all right, and it would be a good deal." (*Id.* at 89-90). Defendant also told M.B. that he had $1,000,000 of his own money invested in Doe Valley Estates. (*Id.* at 90).

The trial evidence established that the day following M.B.'s investment, $598,951.66 from Defendant's account was paid to Pinnacle Management Group, and on that same date and from that same account, $200,000 was used for the purchase of a second home for Defendant's in-laws. (Dkt. at 94 at 10; *see* Gov't Trial Exhibit 19).

Based on the record evidence, including the trial testimony and exhibits, the Court concludes that the Government has established by a preponderance of the evidence that M.B. was a victim of Defendant's scheme. The Court finds that Defendant obtained M.B.'s money through false and fraudulent pretenses, and at least in part, Defendant intended to use the money to purchase a second home for his in-laws. As a result, a preponderance of the evidence in the record fully supports the loss figure of $200,000 for M.B., as advocated

by the Government.[9]

### 2.    M.C.

Defendant contends that M.C.'s money should not be included in the loss figure because Defendant made no misrepresentation. (Dkt. 96 at 6). Instead, M.C. (and her deceased husband L.C.) invested money through Menasheh Petscher.

Mr. Petscher testified at trial that he did business with Defendant as part of a company called Mason Phillips that sought to acquire properties for investment.[10] Mr. Petscher had a family relationship with M.C. and L.C., and shortly before his death, L.C. raised with Mr. Petscher the concept of investing money with his business. Mr. Petscher contacted Defendant in January 2009, to inquire what rate of return he could obtain—to which Defendant responded either 18 or 20 percent. Mr. Petscher relayed this information to L.C., who gave Mr. Petscher a check made payable to Mason Phillips for $350,000 shortly before he died. Mr. Petscher brought the check to Defendant. The plan was for $250,000 to be invested in property and $100,000 to be invested in the money management side of Mason Phillips (with which Mr. Petscher was not involved). Defendant came up with that split of the money, and it was discussed with L.C. before he provided the money.

---

[9]    Defendant compiled a handwritten list of investors and the amount of money they had lost as a result of his scheme, and that list included $800,000 attributable to M.B. (*See* Dkt. 95-1 at 13).

[10]    The transcript of the cross examination of Menasheh Petscher has been prepared and filed. (Dkt. 93). The transcript of the direct testimony was apparently not ordered and therefore has not yet been prepared. Accordingly, the discussion of Mr. Petscher's testimony is based, at least in part, on the Court's recollection of his direct testimony. Of course, once filed, if the transcript of Mr. Petscher's direct testimony contradicts the Court's description, the transcript controls.

The next morning after giving Mr. Petscher the money, L.C. had another heart attack and told his wife (M.C.) to get the money back. (Dkt. 90 at 9). In response to M.C.'s request, Mr. Petscher called Defendant who claimed that the money was already gone. According to the bank records, Defendant used $71,750 of M.C.'s money to repay another investor (D.H.). (Dkt. 95 at 4; Dkt. 95-1 at 2). In addition, bank records establish that some of that money was used to repay S.A. (Dkt. 107 at 3).

Of the $350,000 that M.C. and L.C. invested, $156,750 was returned, leaving a deficit of $193,250, which the Court concludes should be included as part of the loss due to Defendant's conduct. The Government has established, by a preponderance of the evidence, that M.C. (and her deceased husband L.C.) were victims of Defendant's conduct. Although the direct communications with M.C. and L.C. occurred through Defendant's business partner, Mr. Petscher, the evidence established that Defendant took advantage of and victimized Mr. Petscher, who was 26 years old at the time and naïve as to Defendant's fraudulent intent. In other words, Mr. Petscher's representations to M.C. and L.C. were premised on false representations that Defendant made to Mr. Petscher. Defendant used Mr. Petscher as a tool to further perpetuate his Ponzi scheme, and M.C. and L.C. were Defendant's victims.[11]

3.    Z.B.-M.

In his written statement, Defendant denied knowing Z.B.-M., who transferred about $100,000 into Defendant's checking account. (Dkt. 95-1 at 6). Defendant speculates that

---

[11]    Defendant identified M.C. as an investor who lost $250,000 as a result of his scheme. (*See* Dkt. 95-1 at 13).

this may have been money owed to him by Aaron McIntosh. (*Id.*).

This alleged victim did not testify at trial. According to an FBI-302, Z.B.-M. did not recognize Defendant's name or any associated names. (Dkt. 96-1 at 14).

The record lacks sufficient evidence to conclude by a preponderance of the evidence that Z.B.-M.'s failed investment was due to Defendant's conduct.

        4.    R.G. (including trust money)

Defendant contends that R.G. (his father-in-law) was not a victim investor. (Dkt. 79 at ¶¶ 3-4). While acknowledging that there was no evidence presented at trial to support the notion that R.G. was a victim investor, the Government contends that the conduct involving R.G. meets both the definitions of common scheme or plan and same course of conduct. (Dkt. 83 at 3). The Government cites to evidence that Defendant used some of the money obtained from R.G. to pay personal expenses, the same time period was involved as the other victim investors (2008 through 2010), and Defendant admitted that from 2002 through 2010, he received about $4 million from R.G., including accepting additional money in 2008 from R.G. knowing that his financial situation was falling apart. (*Id.* at 3; *see also* Dkt. 95 at 4-6; Dkt. 95-1 at 9).

The difficulty with including the money obtained from Defendant's father-in-law in the loss calculation is that the record contains no evidence in the record concerning the representations Defendant allegedly made to obtain that money. R.G. is deceased, and the Government concedes that his widow (K.G.) has limited or no knowledge of the nature of the transactions. (*See, e.g.*, Dkt. 91 at 4). Moreover, the nature of the relationship between Defendant and R.G.—as his father-in-law when the money was paid to him—makes it

more difficult to simply conclude based on the timing and nature of the transactions that this was part of Defendant's fraudulent scheme. The money might well have been obtained as a result of Defendant's fraud and been part and parcel of the scheme with which Defendant was charged, tried, and convicted. However, the Court is unable to reach that conclusion by a preponderance of the evidence based on the record.

The money involving the trust related to R.G. presents a closer question. Defendant transferred $40,000 to his own account from the R.G. Irrevocable Trust for which Defendant served as the trustee for the benefit of A.G. (Dkt. 95 at 5; Dkt. 95-1 at 11). Unlike R.G. and K.G.'s personal expenditure of funds, the transfer of trust money to Defendant for personal use appears, on its face, outside the ordinary course. Defendant argues that the record contains no evidence of the trust or trustee obligations; for instance, "[t]he trust could have stated that the trustee would be compensated for his time and efforts with a $40,000 payment on April 29, 2008." (Dkt. 108 at 2). In response to this argument, the Government produced the trust document. (Dkt. 110). However, a review of that document reveals that Defendant, as trustee, was granted broad powers with respect to the expenditure of trust money. (*See id.* at 8-11). For instance, these broad powers included Defendant's right to pay himself for his legal or other professional services. (*See id.* at 10 ¶ 8 ("[T]he Trustee may pay fees for such services to such Trustee or firm without prior approval of any court or any beneficiary and whether or not there is a Co-Trustee to approve such payment.")). As a result, the Court will not include the trust money in the loss calculation. The payment of the trust money to Defendant—or even, for that matter, establishing the trust and granting Defendant such broad powers—could have been part of

Defendant's fraudulent scheme, but the Court is unable to reach that conclusion based on a preponderance of the evidence.

     5.     <u>Adjusted Loss Figure and Government's Additional Arguments regarding D.H., R.T., and S.A.</u>

Before addressing the additional issues that the Government raises with respect to D.H., R.T., and S.A., the Court sets forth the recalculated loss amount based on the above discussion.

| Victim Investors | Initial Date | Investment Amount (Principal) | Investment Returned | Victim Investor Loss |
|---|---|---|---|---|
| S.A. | 01/01/2008 | $1,502,544 | $  415,629 | ($1,086,915) |
| N.W. & J.W. | 06/23/2008 | $   100,000 | $   17,750 | ($    82,250) |
| C.C. & E.C. | 09/24/2008 | $    75,000 | $    9,750 | ($    65,250) |
| A.M. | 09/01/2009 | $  446,232 | $   37,500 | ($  408,732) |
| M.B. | 09/22/2008 | $  850,000 | $   80,341 | ($  200,000) |
| M.C. (L.C. is deceased) | 01/08/2009 | $  350,000 | $  156,750 | ($  193,250) |
| TOTAL | | | | ($2,036,397) |

The Government has also argued that $70,000 attributable to D.H.'s investment, $51,200 attributable to R.T.'s investment, and an additional $348,234 attributable to S.A.'s investment should be included in the loss figure (i.e. a total additional amount of $469,434). (*See* Dkt. 107 at 1-4). If these additional amounts are included, the loss amount would slightly exceed $2,500,000 (*i.e.*, $469,434 + $2,036,397 = $2,505,831).

The PSR calculated the loss amounts for each of Defendant's investors based upon actual loss—in other words, the total amounts paid by each investor to Defendant less any amounts returned by Defendant. (*See* Dkt. 84 at ¶ 39). The Government did not initially object to that methodology employed by the PSR. However, in a filing on January 10,

2018, the Government argued that for certain investors the loss figures should include the amount of property taken, even if all or part of the property has been returned, citing to *United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997), and *United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994). (*See* Dkt. 95 at 2).

In response, Defendant contends that there is no information in the record concerning the terms of the investments by D.H. and R.T. or existence of any misrepresentations. (Dkt. 96 at 4). Moreover, Defendant argues that including the money invested by D.H. and R.T. would be impermissible double counting, and the Government's reliance on *Carrozzella* and *Mucciante* is misplaced as those cases construed U.S.S.G. § 2F1.1(b)(1), the predecessor to U.S.S.G. § 2B1.1, and the fraud guidelines were substantially revised in 2001.

According to the Government, R.T. invested a total of $101,800, during the time period January 2009 through January 2011.[12] (Dkt. 95 at 3). Defendant repaid R.T. a total of $102,450 between March 2009 and February 2010. (*Id.*; *see* Dkt. 95-1 at 2). The bank records establish that R.T. was repaid with $51,200 invested by S.A. (Dkt. 95 at 3; Dkt. 95-1 at 2). According to the Government, this $51,200 of S.A.'s money should be included as part of the loss calculation. (Dkt. 107 at 4).

---

[12]     From a review of Government Trial Exhibit 208J, an FBI-302 reflecting an interview with R.T., it appears as though $1,800 of this amount was not invested with Defendant, but rather was payment for legal services purportedly rendered by Defendant after the investments were made.

According to the Government, D.H. invested $70,000 with Defendant in September 2008, and Defendant repaid D.H. $73,500 between November 2008 and January 2009. (Dkt. 95 at 4; *see* Dkt. 95-1 at 2). The bank records establish that D.H. was paid using $71,500 of M.C.'s money. (Dkt. 95 at 4; *see* Dkt. 95-1 at 2). Thus, according to the Government, this $70,000 of M.C.'s money should be included as part of the loss calculation. (Dkt. 107 at 4).

With respect to $348,234 of the $415,629 repaid to S.A., the Government contends that bank records establish that $348,234 constituted other investors' money (namely M.C., R.T., and A.M.). (*Id.* at 3). Thus, according to the Government, this $348,234 of M.C.'s, R.T.'s, and A.M.'s money should be included as part of the loss calculation. (*Id.*).[13]

In *Carrozzella*, the Second Circuit held that "loss in fraud cases includes the amount of property taken, even if all or part has been returned." 105 F.3d at 805 (reasoning that the return of money is "often necessarnoy for the scheme to continue"); *see also Mucciante*, 21 F.3d at 1237-38 (defendant not entitled to credit in loss calculation for amounts returned to victims).

---

[13]     Of course, there is an argument that the $51,200 of S.A.'s money paid to R.T. is already included in the loss calculation for S.A.; the $70,000 of M.C.'s money paid to D.H. is already included in the loss calculation for M.C.; and the $348,234 of M.C.'s, R.T.'s, and A.M.'s money paid to S.A. is already included in the loss calculation for at least M.C. and A.M. However, since the loss figures attributable to S.A., M.C., and A.M. are net amounts, it is not clear whether the amounts excluded from total loss (because the money was returned) included these other investors' money. For example, Defendant repaid R.T. with money invested by S.A., and Defendant repaid S.A. with money invested by R.T.; it is not clear how those payments specifically factor into the net loss amount attributable to S.A.'s investment.

However, after the *Carrozzella* decision, the fraud guidelines were substantially revised in 2001. The amendments included "two provisions that persist in the U.S.S.G. in fundamentally the same form to this day: Application Note 2(E), 'Credits Against Loss,' and Application Note 2(F)(iv), 'Ponzi and Other Fraudulent Investment Schemes.'" *United States v. Snelling*, 768 F.3d 509, 513 (6th Cir. 2014).

U.S.S.G. § 2B1.1 Application Note 3(E)(i) provides that loss shall be reduced by the "money returned . . . by the defendant . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1 Application Note 3(F)(iv) provides that in the case of a Ponzi scheme, the loss amount "shall not be reduced by the money . . . transferred to any individual investor in the scheme in excess of that investor's principal investment (*i.e.*, the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme.)." Considering existing Second Circuit caselaw, there is a reasonable argument that when a Ponzi scheme victim receives other investors' money as part of the scheme, that victim has not had his or her money "returned" within the meaning of Application Note 3(E)(i), and therefore, a defendant cannot receive credit for any such "repayment"—in the same way that a defendant cannot receive credit under Application Note 3(F)(iv) for an investor's gain in excess of the amount invested.

In contrast, according to some courts and commentators, these provisions mean that a sentencing court must reduce each victim investor's loss amount by any sums returned, although any such reduction may not exceed the principal amount invested by the investor. *See, e.g., United States v. Nelson*, 774 F.3d 1104, 1106 (7th Cir. 2014); *Snelling*, 768 F.3d at 513-14; Haines, Bowman, & Woll, Federal Sentencing Guidelines Handbook 379-80

(2017-18 ed.) (explaining that 2001 amendments adopted the Eleventh Circuit's approach whereby the loss is the total amount lost by those victims who were out of money at the time of the scheme's discovery, and a defendant is credited with repayments to investors up to the total amount each investor contributed (citing Appendix C, Amendment 317, "Statement of Reasons," at 67)).[14] In fact, when adopting Amendment 617 that revised the fraud guidelines in 2001, the Sentencing Commission appears to have expressly rejected the Second Circuit's approach in *Mucciante* and *Carrozzella*.[15]

---

[14]    It appears as though the Federal Sentencing Guidelines Handbook's citation should be to Amendment 617, not Amendment 317.

[15]    In relevant part, Amendment 617 states as follows in its discussion of the changes to U.S.S.G. § 2B1.1:

> Regarding investment schemes, the amendment resolves a circuit conflict regarding whether and how to credit payments made to victims. *Compare United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994) (under the Guidelines, loss includes the value of all property taken, even though all or part of it was returned.); *United States v. Deavours*, 219 F.3d 400 (5th Cir. 2000) (intended loss is not reduced by any sums returned to investors); and *United States v. Loayza*, 107 F.3d 257 (4th Cir. 1997) (declining to follow the approach of net loss and holding defendants responsible for the value of all property taken, even though all or a part is returned), with *United States v. Holiusa*, 13 F.3d 1043 (7th Cir. 1994) (holding that only the net loss should be included in loss, thus allowing a credit for returned interest), and *United States v. Orton*, 73 F.3d 331 (11th Cir. 1996) (only payments made to losing investors should be credited, not payments to investors who made a profit).

> This amendment adopts the approach of the Eleventh Circuit that excludes the gain to any individual investor in the scheme from being used to offset the loss to other individual investors because any gain realized by an individual investor is designed to lure others into the fraudulent scheme. *See United States v. Orton*, *supra*.

Notwithstanding the Sentencing Commission's commentary when adopting these 2001 changes to U.S.S.G. § 2B1.1, the Second Circuit has not expressly adopted the position that other victim money returned to a victim as part of a Ponzi scheme should be excluded from loss. As recently as 2013, the court continued to favorably cite the *Carrozzella* decision. *See United States v. Vilar*, 729 F.3d 62, 96 n.34 (2d Cir. 2013). Moreover, in *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012), the Second Circuit concluded that a sentencing court did not err in calculating the loss amount to include the "earnings" that victims reinvested in a Ponzi scheme as part of intended loss, even though the "earnings" were created and reinvested as part of the scheme itself. *Id.* at 120-21.

In essence, the Government seeks to calculate loss, at least in part, as the intended loss by Defendant with respect to certain investors who were repaid part of their investments with other investors' money. In other words, even though Application Note 3(E)(i) provides that loss shall be reduced by the "money returned . . . by the defendant . . . to the victim before the offense was detected," the Government contends that under existing Second Circuit precedent Defendant should not be able to reduce the loss figures by the amounts returned to the victims with other victims' money. Thus, the $51,200 of S.A.'s money that was used to repay R.T., the $70,000 of M.C.'s money that was used to repay D.H., and the $348,234 of M.C.'s, R.T.'s, and A.M.'s money that was used to repay S.A., although not constituting actual loss, would constitute intended loss by Defendant. And of course, pursuant to U.S.S.G. § 2B1.1 Application Note 3(A), "loss is the greater of actual loss or intended loss."

Even if this was the appropriate methodology by which to calculate loss, the Court cannot on this record conclude that the Government has demonstrated by a preponderance of the evidence that the sums invested by and returned to D.H. and R.T. were within the scope of the pecuniary harm that Defendant purposely sought to inflict (*i.e.*, intended loss). *See* U.S.S.G. § 2B1.1 Application Note 3(A)(ii) (defining intended loss). Unlike S.A., who testified at trial and about whom the Court has sufficient information to conclude that the nature of Defendant's dealings with S.A. were fraudulent, the Court has virtually no information about D.H.'s or R.T.'s investments—other than the fact that they occurred during the same time period as Defendant's scheme and they were repaid with victim investors' money.[16]

In sum, although the Court acknowledges that the challenges in determining loss are largely due to Defendant's own efforts to conceal his fraudulent activity and that a more aggressive approach may be justified in calculating the loss amounts attributable to Defendant's conduct, the Court is not satisfied that this record supports including the money returned to R.T. and D.H. in the loss calculation, even if the law supported utilizing a methodology that included it. The Court is confident, based on the evidence presented

---

[16] An FBI-302 reflecting an interview with R.T. was marked as a Government Trial Exhibit 208J. It provides some additional information concerning the nature of R.T.'s investments with Defendant, but does not establish the scope of pecuniary harm that Defendant purposely sought to inflict with respect to R.T. by a preponderance of the evidence. Moreover, even if this was sufficient to reach a conclusion concerning R.T., it does not appear as though the record contains any comparable documentation concerning D.H. The Court also notes that Defendant did not identify either R.T. or D.H. as one of his victims when he compiled a handwritten list of his victims (perhaps because they had already been made whole). (*See* Dkt. 95-1 at 13).

to it, that the loss attributable to Defendant's conduct was greater than $2,000,000 but less than $2,500,000. Therefore, based on the particular facts of this case, and the evidence that is in the record before the Court, the Court concludes that the loss amount is in that range (*i.e.*, greater than $2 million but less than $2.5 million). *See Hsu*, 669 F.3d at 122 (acknowledging that method used by district court was not the only way to measure loss in Ponzi scheme case, and recognizing that other methodologies might have been appropriate or even preferable, depending on the particular facts of the case).

## B.  SUBSTANTIAL HARDSHIP—U.S.S.G. § 2B1.1(b)(2)(A)(iii)

U.S.S.G. § 2B1.1(b)(2)(A)(iii), which became effective on November 1, 2015, provides for a two-level increase in the offense level if the offense resulted in "substantial financial hardship" to one or more victims. Application Note 4(F) provides as follows:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—
>
> > (i) becoming insolvent;
> >
> > (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
> >
> > (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
> >
> > (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;
> >
> > (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
> >
> > (vi) suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B.1.1 Application Note 4(F). Because of its recent enactment, few cases have interpreted the provision.

In *United States v. Poulson*, 871 F.3d 261 (3d Cir. 2017), the Third Circuit expressed its view that "'substantial financial hardship' is subject to the usual—and significant—degree of discretion afforded a district court during sentencing," explaining as follows:

> [B]etween a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to charity), and a devastating loss (occurring in the wake of a scheme to wipe out a victim's life savings), there lies a wide range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4[(F)]. In the end, this is just one more determination of a fact that bears on the ultimate sentence; that determination is entitled to the normal deference that applies to all facts found at sentencing.

*Id.* at 268 (alteration in original) (quoting *United States v. Minhas*, 850 F.3d 873, 878 (7th Cir. 2017)); *see also United States v. Castaneda-Pozo*, 877 F.3d 1249, 1252-53 (11th Cir. 2017) (although monetary amount of losses was minimal, the defendant's actions "made his victims insecure in life's basic necessities" and thus rose to the level of substantial financial hardship); *United States v. Brandriet*, 840 F.3d 558, 561-62 (8th Cir. 2016) (even though direct evidence of substantial financial hardship was thin, district court did not err in finding substantial financial hardship based on inferences drawn from the evidence).

In *Poulson*, the Third Circuit explained that substantial financial hardship "is measured on a sliding scale that is also fairly subjective." 871 F.3d at 268. The Third Circuit went on to explain as follows:

> When applying the term to financial hardship in the sentencing context, therefore, we ought to consider not only the pecuniary value of the loss but also such intangibles as its impact on the victim. A loss of a large volume of savings that is quickly regained or has minimal effect on the victim is likely

not a substantial financial hardship. As when using "substantial" in other contexts, so too here, there is no specific percentage of total earnings or duration of impact that demarcates a substantial financial hardship from an insubstantial one. The term's fluidity across various legal applications thus buttresses the conclusion of the District Court and of other courts that drawing inferences based on a variety of facts is appropriate in construing "substantial financial hardship."

*Id.* at 269. As similarly explained by the Seventh Circuit, "[t]he same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup." *Minhas*, 850 F.3d at 877.

Here, the PSR concluded that the two-level enhancement was warranted because Z.B.-M delayed her retirement due to Defendant's fraudulent activities, and N.W. and J.W. suffered substantial losses to their whole life insurance policies and annuities. (Dkt. 84 at ¶ 49). Defendant argues in his objections that the record lacked support for this conclusion since neither Z.B.-M. nor N.W. and J.W. testified at trial. (Dkt. 79 at ¶ 8).

As noted above, the Court cannot conclude that Z.B.-M.'s losses were the result of Defendant's fraudulent scheme. However, the Government contends that N.W. and J.W., M.B., and M.C. all suffered substantial financial hardship for purposes of considering this enhancement. The Government presented evidence that Defendant's conduct resulted in a loss to N.W. and J.W. of $100,000 from money they intended to use for retirement, amounting to roughly a 12.5 to 14.29 percent loss of their total retirement savings. (Dkt. 95 at 7; Dkt. 95-1 at 15-16). The Government also presented evidence that the $850,000 that M.B. gave to Defendant was approximately 20 percent of M.B.'s net worth, and this impacted his retirement savings. (Dkt. 95 at 7; Dkt. 95-1 at 18-19). Finally, the Government pointed to M.C., who is now 77 years of age and lost $193,250 due to

Defendant's conduct. (Dkt. 95 at 8; Dkt. 95-1 at 21-22). Of note, M.C. suffered this loss at the same time that she became a widow due to the death of her husband.

In response to this supplemental submission, Defendant contends that the victims relied on by the Government in support of this enhancement "did not have consequences touching on their basic living necessities to justify the enhancement." (Dkt. 96 at 10). Defendant further argues that neither M.B. nor M.C. were victims because "they did not sustain a part of the actual loss," and although J.W. cites to the reduction in available retirement money, she admits "to no impact from this loss." (Id.).

The record evidence before the Court demonstrates otherwise. The Government has shown by a preponderance of the evidence that the two-level enhancement set forth in U.S.S.G. § 2B1.1(b)(2)(A)(iii) applies. As discussed above in connection with the loss figure, M.C. and M.B. were both victims of Defendant's conduct. Although the loss applied to M.B.'s investment is not the full $850,000, even without a consideration of M.B.'s loss, it is apparent that both M.C. and J.W. (and N.W.) suffered substantial financial hardship.

Defendant took $350,000 from M.C. right when her husband passed away. While she was repaid just over $150,000, the evidence demonstrates that M.C. lives on a modest and fixed income, and that if the fraudulently obtained money was returned to her, it would "make a radical difference in her financial health." (Dkt. 95-1 at 22). M.C. is "scared and worried about how she will reach the end of her life . . . while maintaining an income stream." (Id.).

Similarly, J.W. explained that she and her husband operate a dairy farm, and they have a "modest, middle-class life, and they earn every penny they make." (*Id.* at 15). A significant source of planned retirement for J.W. and her husband is a long-term life insurance policy that was the source of the money paid to Defendant. If the money had not been paid to Defendant, the policy's value would be about one-third higher than its anticipated value when they retire. (*Id.*). According to J.W., she and her husband have not yet experienced the financial impact of Defendant's fraud as it relates to their retirement savings, but J.W. did describe the impact as "a significant portion of their total retirement nest egg." (*Id.* at 16).

Based on the case law referenced above and the guidance from Application Note 4(F), the Court concludes that the evidence establishes by a preponderance of the evidence that both M.C. and J.W. (and N.W.) have suffered a substantial financial impact as a result of Defendant's conduct, and therefore, a two-level enhancement is warranted pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii).

## C.    SOPHISTICATED MEANS—U.S.S.G. § 2B1.1(b)(10)(C)

U.S.S.G. § 2B1.1(b)(10)(C) provides for a two-level increase in the offense level if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Application Note 9(B) defines "sophisticated means" as follows:

> especially complex or especially intricate offense conduct pertaining to the execution of concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both,

through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1 Application Note 9(B). Here, the PSR concludes that this two-level enhancement is appropriate, stating as follows:

> Specifically, the defendant devised a scheme to defraud investors out of money and property by offering individuals false and fraudulent investments with guaranteed rates of return ranging from 12-15 percent. In order to entice investors to invest, the defendant represented that the investment would be secured by real estate or life insurance policies. It was further part of the defendant's scheme to provide victim investors with interest payments or returns on their investments from monies received from other investors, in order to encourage the victims to invest more money or roll over prior investments with the defendant.

(Dkt. 84 at ¶ 50).

Defendant objects to this enhancement, contending that the scheme involved "straightforward solicitations from victim investors through the defendant himself or through one of his real businesses involving actual promissory notes." (Dkt. 79 at ¶ 9). Although Defendant acknowledges that "the vast majority of Ponzi schemes" apply this enhancement (Dkt. 85 at 2), he argues that the scheme was straightforward and simple, and the misrepresentations involved in the scheme cannot transform the fraud into the sophisticated level needed for this enhancement; otherwise, almost every fraud scheme would result in this two-level enhancement. (Dkt. 96 at 11-12).

The Government counters that the Court should look at the scheme as a whole, and apply the enhancement because:

> [D]efendant deposited the solicited funds into various limited liability companies he created. Often times he subsequently transferred the funds between accounts. In addition, he enticed investors to roll their investments over by giving the impression their investment was safe by paying a

scheduled interest payment but then promising a higher rate of return if they let him continue to use their money. To further hide the scheme the defendant created fake promissory notes, knowing full well that they would not be paid. Furthermore, he sometimes provided documents purporting to be the real estate that secured the investment.

(Dkt. 83 at 6). The Government cites to the following facts in support of its contention that the sophisticated means enhancement applies:

- Defendant "created fictitious loan documents, with short repayment terms, to reassure even conservative investors their money was secure" (Dkt. 95 at 9);

- Defendant "created a Ponzi scheme where he would pay earlier investors with other investor money in order to entice the investors to reinvest their money and create the illusion their money was safe" (*id.*);

- The Government presented charts depicting an overview analysis prepared from Defendant's bank account records for the years 2007 through 2011 setting forth inflow and outflow of money and number of transactions maintained over 12 bank accounts with active money movements, and over which Defendant retained complete control (*id.* at 10 & Ex. I);

- Defendant represented to victims that their investments were secured by property and would show the victims documents purporting to represent how their money was secured (*id.* at 10 & Ex. J);

- Defendant "prepared and mailed a fake promissory note to [A.M.] . . . in order to keep the scheme from being detected" (*id.* at 10);

- Defendant "embellished his net worth in order to entice investors to invest" (*id.* at 10 & Ex. B);

- Defendant "maintained a personal international bank account with HSBC to allow international bank transfers from his Canadian victim investor" (*id.* at 10);

- Defendant "[p]urchased a life settlement contract which the defendant claimed secured [S.A.'s] . . . investment, but unbeknownst to S.A., Defendant used S.A.'s money to purchase the policy (*id.* at 11).

The Court concludes that the Government has met its burden to establish facts supporting application of the sophisticated means enhancement to Defendant's offense.

Although each of Defendant's discrete actions may not have been sophisticated in and of itself, Defendant's entire scheme—a successful Ponzi scheme that touched victims in the United States and Canada and allowed Defendant to avoid detection for many years—rose to the level of the sophistication contemplated by U.S.S.G. § 2B1.1(b)(10)(C). *See United States v. Elia*, 392 F. App'x 883, 886 (2d Cir. 2010) (even if individual actions were not themselves sophisticated, "the coordination of these actions clearly involves sophistication"); *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) ("[E]ven if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together so that [the defendant] . . . could perceive and exploit different vulnerabilities in different systems in a coordinated way."); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996) ("Even if each step in the [scheme] . . . was simple, when viewed together, the steps comprised a plan more complex than merely filling out a false tax return.").

Here, Defendant engaged in repetitive and coordinated conduct to defraud victims and use those victims' money to pay earlier victims, thus perpetuating the nature, length and scope of the scheme and allowing him to avoid detection. *See United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) (explaining that "the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense" and "repetitive and coordinated nature" of conduct can reveal the sophisticated means employed by a defendant so as to justify imposition of the two-level enhancement). Defendant falsely represented that the investments would be secured by real estate and life insurance policies; he deposited the funds into various limited liability

companies he created; he transferred funds among his many accounts; he escalated his fraudulent representations by promising higher rates of return if victims continued to let Defendant use his money; and he created fake promissory notes and loan documentation knowing that the notes would never be paid.

This was not a garden-variety mail fraud scheme. *United States v. Cole*, 296 F. App'x 195, 197 (2d Cir. 2008) ("In determining whether to apply the enhancement to a mail fraud case, courts have asked where the defendant's mail fraud scheme, 'when viewed as a whole, was notably more intricate than that of a garden-variety mail fraud scheme.'" (quoting *United States v. Hance*, 501 F.3d 900, 909-10 (8th Cir. 2007)). Rather, based on a consideration of all the circumstances of Defendant's offense, the Court concludes that the sophisticated means enhancement should be applied. *See, e.g., United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) (district court appropriately concluded that two-level enhancement applied where scheme lasted several years; reflected careful planning; included effort to conceal fraud by lying to business partners, lawyers and investors; relied on creating and disseminating marketing publications that contained material misrepresentations; and involved creation of fictitious documents for purpose of convincing investors to give money); *see also United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (defendant's fabrication of sophisticated false documents relating to status of funds he took from his victims constituted sophisticated means); *United States v. Regensberg*, 381 F. App'x 60, 62 (2d Cir. 2010) (finding two-level sophisticated means enhancement appropriate for Ponzi scheme perpetrated for three years).

### D.   2010 GUIDELINES VERSUS 2016 GUIDELINES

Based on its findings above, the Court therefore calculates the offense level under the 2010 Guidelines and 2016 Guidelines in view of the *ex post facto* issue discussed above.

Under both manuals, the base offense level is the same (seven, pursuant to U.S.S.G. § 2B1.1(a)(1)), and the sophisticated means enhancement is the same (two, pursuant to U.S.S.G. § 2B1.1(b)(10)(C)[17]).   With respect to the loss amount, since the Court has calculated the total loss as greater than $2 million but less than $2.5 million, the increase under either manual would be 16 pursuant to U.S.S.G. § 2B1.1(b)(1) (even though the threshold levels are different under each manual).   Therefore, the manual selection is driven by the substantial hardship enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(iii).

Using the 2010 Guidelines Manual, Defendant's total offense level is 27, calculated as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Loss Amount (U.S.S.G. § 2B1.1(b)(1)) | 16 |
| Sophisticated Means (U.S.S.G. § 2B1.1(b)(9)(C)) | 2 |
| Role in Offense (U.S.S.G. § 3B1.3) | 2 |

In contrast, using the 2016 Guidelines Manual, Defendant's total offense level is 29 because two levels are added pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii).   As a result, since

---

[17]   The 2010 Guidelines Manual sets forth the sophisticated means enhancement at U.S.S.G. § 2B1.1(b)(9)(C) as applying where the "offense otherwise involved sophisticated means."

the 2010 Guidelines Manual does not contain that enhancement, that is the manual that the Court will use in sentencing so as to avoid an *ex post facto* issue.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court concludes that the 2010 Guidelines Manual applies and Defendant's total offense level is 27. With a criminal history category of I, this results in a recommended range for incarceration under the Sentencing Guidelines of 70 to 87 months.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      June 15, 2018
            Rochester, New York